IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| AMY LEMMON,<br><br>            Plaintiff,<br><br>vs.<br><br>ROCKY MOUNTAIN ANESTHESIOLOGY, P.C.,<br><br>            Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 17)**<br><br>Case No. 1:19-cv-00078-DAO<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Amy Lemmon brought this action against her former employer, Defendant Rocky Mountain Anesthesiology, P.C. ("RMA"), asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for gender discrimination, unlawful retaliation, and harassment based on gender. (Compl. ¶¶ 65–85, Doc. No. 2-1.) Ms. Lemmon alleges she was sexually harassed by two other RMA employees during her employment, and that RMA retaliated against her and wrongfully terminated her because she reported the harassment. (*Id.* ¶¶ 4–64.) RMA now moves for summary judgment on all claims, asserting that RMA is not subject to the requirements of Title VII because it did not have fifteen or more employees during the period of time at issue. (Mot. for Summ. J. ("Mot.") 2, Doc. No. 17.) Specifically, RMA argues its "physician-shareholders" are not employees for purposes of Title VII and, excluding those physician-shareholders, it had fewer than fifteen employees during the relevant time period. (*Id.*) Ms. Lemmon opposed the motion, arguing RMA's physician-shareholders are employees for purposes of Title VII. (Mem. Opposing Def.'s Mot. for Summ. J. ("Opp'n") 12, Doc. No. 20.) The court held a hearing on the motion on June 25, 2020. (Doc. No. 27.)

Having considered the parties' briefing and arguments at the hearing, the court[1] concludes, based on the undisputed facts presented on summary judgment, that RMA's physician-shareholders are not employees under Title VII.  Excluding these physician-shareholders, RMA had fewer than the requisite fifteen employees during the relevant time period and is not subject to the provisions of Title VII.  Accordingly, the court GRANTS RMA's Motion for Summary Judgment (Doc. No. 17) and enters summary judgment in favor of RMA and against Ms. Lemmon on all claims.

## SUMMARY JUDGMENT STANDARD

The court grants summary judgment when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented.'"  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (internal quotations omitted)).  In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor.  *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

"'[W]here the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order

---

[1] The parties consent to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (Doc. No. 10.)

to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Further, "in opposing a motion for summary judgment, the non-moving party 'cannot rest on ignorance of facts, on speculation, or on suspicion.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

## RELEVANT FACTS

The court considers the following facts in determining RMA's motion for summary judgment.  All facts come from the parties' briefs and accompanying exhibits.  The facts relevant to this motion are largely undisputed, and the court draws all reasonable inferences in favor of Ms. Lemmon.[2]

---

[2] In her opposition, Ms. Lemmon purports to dispute many of the statements of fact set out in RMA's motion, but she did not provide relevant countervailing declarations or cite to materials in the record which would establish a genuine dispute as to those facts.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . .").  Ms. Lemmon submitted her own declaration in which she verified the allegations in her Complaint, (Ex. A to Opp'n, Decl. of Amy Lemmon ¶ 3, Doc. No. 20-2), but the allegations it contains do not illuminate the issue before the court on summary judgment—namely, whether RMA's physician-shareholders are employees for purposes of Title VII.  (*See generally* Compl., Doc. No. 2-1.)  Ms. Lemmon also provided a declaration from her attorney regarding the need for additional discovery.  (Ex. B to Opp'n, Decl. of Kurt W. Laird ¶¶ 3–6, Doc. No. 20-3; *see also* Opp'n 1, 10–12, 14, 18, 23, Doc. No. 20 (requesting additional discovery before a ruling on the motion for summary judgment).)  However, Ms. Lemmon's counsel withdrew the request for additional discovery at the June 25, 2020 hearing on the summary judgment motion.  Accordingly, neither of the declarations filed with Ms. Lemmon's opposition raise a genuine dispute as to the statements of fact set out in RMA's motion.

In some instances, Ms. Lemmon disputes RMA's characterization of documents attached as exhibits to RMA's motion or the inferences drawn from them.  In these instances, the court relies on the underlying documents rather than RMA's characterization and resolves any disputed inferences in favor of Ms. Lemmon as the non-moving party.

RMA is a professional corporation which provides anesthesiology services at Ogden

Regional Medical Center, a hospital in Ogden, Utah.  (Mot., Statement of Undisputed Material

Facts ("Facts") ¶¶ 1–2, Doc. No. 17; Ex. A to Mot., Decl. of Dr. Travis Slade ("Slade Decl.")

¶¶ 5–6, Doc. No. 17-2.)  Ms. Lemmon began working as a student at Ogden Regional Medical

Center in December 2013 and was assigned to work several clinical rotations with RMA.  (Mot.,

Facts ¶ 46, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 60, Doc. No. 17-2; Ex. A to Opp'n, Decl.

of Amy Lemmon ("Lemmon Decl.") ¶ 3 (verifying the allegations in her Complaint), Doc. No.

20-2; Compl. ¶¶ 2, 21, Doc. No. 2-1.)  Ms. Lemmon was later employed by RMA as a Certified

Registered Nurse Anesthetist (CRNA) from January 1, 2016 to October 6, 2017.  (Mot., Facts

¶¶ 48–50, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶¶ 62–64, Doc. No. 17-2.)

According to Ms. Lemmon, she was sexually harassed by two other CRNAs beginning

when she was a student and continuing during her employment at RMA in 2016 and 2017.  (Ex.

A to Opp'n, Lemmon Decl. ¶ 3 (verifying the allegations in her Complaint), Doc. No. 20-2;

Compl. ¶¶ 4–64, Doc. No. 2-1.)  She describes inappropriate comments and text messages

regarding her physical appearance; unwanted physical touching, including a CRNA slapping her

backside; and "offensive gestures such as hip thrusting [her] from behind while she was

intubating a patient."  (Ex. A to Opp'n, Lemmon Decl. ¶ 3, Doc. No. 20-2; Compl. ¶¶ 4, 7, 10–

14, 35–37, Doc. No. 2-1.)  She asserts RMA retaliated against her and ultimately terminated her

because she reported this harassment.  (Ex. A to Opp'n, Lemmon Decl. ¶ 3, Doc. No. 20-2;

Compl. ¶¶ 39–64, Doc. No. 2-1.)

In 2016 and 2017, RMA had six physician-shareholders.  (Mot., Facts ¶ 5, Doc. No. 17;

Ex. A to Mot., Slade Decl. ¶ 10, Doc. No. 17-2.)  In 2016, excluding these physician-

shareholders, RMA had twelve employees—eleven CRNAs and one physician, Dr. Wade, who

was not a shareholder—for each working day in twenty or more calendar weeks.[3]  (Mot., Facts ¶ 44, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶¶ 48–49, 58, Doc. No. 17-2.)  In 2017, excluding the physician-shareholders, RMA had a total of thirteen employees—twelve CRNAs plus Dr. Wade—for each working day in twenty or more calendar weeks.  (Reply in Support of Def.'s Mot. for Summ. J. ("Reply") 13, Doc. No. 21; Ex. F to Reply, Corrected Decl. of Dr. Travis Slade ("Corrected Slade Decl.") ¶ 9, Doc. No. 21-1.)

When a physician desires to join RMA as a shareholder, RMA requires the physician to purchase a share of ownership in RMA.  (Mot., Facts ¶ 7, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 12, Doc. No. 17-2.)  The physician-shareholder must also enter into a "Shareholder Employment Agreement" with RMA.  (Mot., Facts ¶ 8, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 13, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., RMA Shareholder Employment Agreement ("Agreement"), Doc. No. 17-2 at 24–40.)  The Shareholder Employment Agreement refers to RMA's physician-shareholders as "employees" of RMA throughout the document.  (Ex. 2 to Ex. A to Mot., Agreement ¶¶ 2, 3, 7, 9, Doc. No. 17-2.)  The Agreement states, "Physician shall be an employee of [RMA] . . . and shall be entitled to all of the rights and bound by all of the obligations incident to that status, including all contracts and the Rules and Regulations, as amended, of [RMA]."  (*Id.* ¶ 3.)

The Agreement also provides that each "physician shall be elected an officer of the corporation and shall be able to vote on all matters pertaining to the operation of the corporation."  (Ex. 2 to Ex. A to Mot., Agreement ¶ 16, Doc. No. 17-2.)  All of RMA's

---

[3] To qualify as an "employer" under Title VII, an organization must have "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).

physician-shareholders have input into RMA's business decisions, including the ability to vote

on business decisions.  (Mot., Facts ¶ 11, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 17, Doc. No.

17-2.)  RMA makes business decisions, such as whether to purchase equipment or terminate its

nurses, by a majority vote of all of RMA's physicians.  (Mot., Facts ¶ 12, Doc. No. 17; Ex. A to

Mot., Slade Decl. ¶ 18, Doc. No. 17-2.)  Each of the physician-shareholders is given an equal

vote on RMA's business decisions and operations.  (Mot., Facts ¶ 13, Doc. No. 17; Ex. A to

Mot., Slade Decl. ¶¶ 19–20, Doc. No. 17-2.)

      The physician-shareholders are all equals in RMA's hierarchy, and none are viewed as

having authority over any others.  (Mot., Facts ¶ 24, Doc. No. 17; Ex. A to Mot., Slade Decl.

¶ 29, Doc. No. 17-2.)  The physician-shareholders do not report to any of the others as superiors,

nor are they supervised by any of the others.  (Mot., Facts ¶ 25, Doc. No. 17; Ex. A to Mot.,

Slade Decl. ¶ 30, Doc. No. 17-2.)  RMA expects the physician-shareholders to use their own

independent judgment as professional anesthesiologists in their day-to-day work.  (Mot., Facts

¶ 26, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 31, Doc. No. 17-2; Ex. 2 to Ex. A to Mot.,

Agreement ¶ 6, Doc. No. 17-2.)

      Nevertheless, the Agreement provides that "[w]hile [a] [p]hysician shall be free to

exercise his or her own judgment as to how to treat a particular patient, he/she shall comply with

the Rules and Regulations of [RMA] governing the practice of medicine and anesthesiology by

physicians employed by [RMA]."  (Ex. 2 to Ex. A to Mot., Agreement ¶ 6, Doc. No. 17-2.)  It

also states each physician "shall be subject to the direction of the Board of Directors of [RMA]

and the officers of [RMA] with respect to all business matters connected with his/her practice of

medicine and anesthesiology, such as whom he/she may accept as patients, the procedures he/she

may perform, the charges that may be made for professional services performed by him/her, and the hours of the day or night that he/she must be on duty." (*Id.*)

The Agreement allows RMA to terminate a physician-shareholder who fails to comply with the terms and conditions of the agreement. (Ex. 2 to Ex. A to Mot., Agreement ¶ 4, Doc. No. 17-2.) Before termination, the Agreement requires RMA to provide written notice describing the violation "in detail," and gives the physician-shareholder a thirty-day period to correct the violation. (*Id.*) The physician shareholder also has the right to make a presentation challenging the termination. (*Id.*; *see also* Mot., Facts ¶¶ 16–17, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶¶ 24–25, Doc. No. 17-2.) Termination of a physician-shareholder may only be authorized by majority vote of the other physician-shareholders. (Mot., Facts ¶ 18, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 26, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., Agreement ¶ 4, Doc. No. 17-2.) The physician-shareholder facing termination is not entitled to a vote. (Mot., Facts ¶ 18, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 26, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., Agreement ¶ 4, Doc. No. 17-2.) In practice, the physician-shareholders have typically required a supermajority or consensus for all terminations, including terminations of physician-shareholders and CRNAs. (Mot., Facts ¶ 19, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 27, Doc. No. 17-2.)

RMA's physician-shareholders are not paid a fixed salary; rather, they are paid a monthly draw based on the income collected by RMA, minus certain operating expenses. (Mot., Facts ¶ 20, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 42, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., Agreement Exhibit A ¶ A(2), Doc. No. 17-2.) The pay of RMA's physician-shareholders can vary greatly month-to-month because RMA's income and losses/expenses—such as equipment, legal expenses, insurance, and taxes—often fluctuate. (Mot., Facts ¶ 22, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 44, Doc. No. 17-2.) Each physician-shareholder also pays a proportionate

share of the cost of malpractice insurance.  (Ex. 2 to Ex. A. to Mot., Agreement ¶ 11, Doc. No. 17-2.)

## DISCUSSION

Under Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 503 (2006) (citing 42 U.S.C. § 2000e-2(a)(1)).  Title VII's antiretaliation provision also "makes it unlawful for an employer to discriminate against any of its employees for filing complaints of discrimination."  *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 205 (1997) (citing 42 U.S.C. § 2000e-3(a)).

Under Title VII, "employer" includes only those organizations having "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).  Thus, an organization employing fewer than fifteen people is not subject to the provisions of Title VII.  *Castille v. Compliance Solutions*, 29 Fed. App'x 559, 561 (10th Cir. Jan. 30, 2002) (unpublished) (citing *Walters*, 519 U.S. at 205).  "[T]he threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief."  *Arbaugh*, 546 U.S. at 516.

"Employee," under Title VII, is defined as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  Under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, the Supreme Court has characterized this same definition of "employee" as a "nominal definition that is completely circular and explains nothing."  *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444 (2003) (internal quotation marks omitted); *see also* 42 U.S.C. § 12111(4) (defining "employee" under the ADA as "an individual employed by an employer").  In the absence of a useful statutory definition, the Supreme Court in *Clackamas* held that the common-law element of control is "the principal guidepost" in assessing whether a

person is an employee.  538 U.S. at 448.  The *Clackamas* Court adopted a list of six factors

courts should consider to determine "whether a shareholder-director is an employee":

> [1.] Whether the organization can hire or fire the individual or set
> the rules and regulations of the individual's work
>
> [2.] Whether and, if so, to what extent the organization supervises
> the individual's work
>
> [3.] Whether the individual reports to someone higher in the
> organization
>
> [4.] Whether and, if so, to what extent the individual is able to
> influence the organization
>
> [5.] Whether the parties intended that the individual be an
> employee, as expressed in written agreements or contracts
>
> [6.] Whether the individual shares in the profits, losses, and
> liabilities of the organization

*Id.* at 449–50 (internal quotation marks omitted).  The Court emphasized that all aspects of the

relationship between the shareholder and the organization should be considered; no one factor

should be decisive.  *Id.* at 451.

Although the *Clackamas* Court considered the definition of "employee" under the ADA,

the six-factor analysis from *Clackamas* likewise applies under Title VII to determine whether

shareholders are employees, because the statutory definitions are identical.  *Compare* 42 U.S.C.

§ 12111(4) *with* 42 U.S.C. § 2000e(f); *see also Mariotti v. Mariotti Bldg. Prods.*, 714 F.3d 761,

766 (3d Cir. 2013) (holding that the *Clackamas* test applies to Title VII); *Solon v. Kaplan*, 398

F.3d 629, 632–33 (7th Cir. 2005) (same).

RMA contends it had fewer than the requisite fifteen employees necessary for Title VII to

apply because its physician-shareholders are not employees under the *Clackamas* test.  (Mot. 2,

12–20, Doc. No. 17.)  In response, Ms. Lemmon argues the court should use the "payroll

method" from *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202 (1997),

rather than the *Clackamas* test to determine the number of employees RMA employed during the

relevant time period.  (Opp'n 13, Doc. No. 20.)  She contends that, under the payroll test, the

physician-shareholders qualify as employees because they are on RMA's payroll.  (*Id.*)  Ms.

Lemmon also asserts that RMA's physician-shareholders are employees under the *Clackamas*

test.[4]  (*Id.* at 14–23.)

The court first addresses the applicability of the payroll method, and then turns to an

analysis of *Clackamas* factors.

## A.  The Payroll Method

The Supreme Court in *Walters* addressed how to calculate the number of employees on a

given "working day," for purposes of the provision in Title VII requiring at least fifteen

employees "for each working day in each of twenty or more calendar weeks in the current or

preceding calendar year."  42 U.S.C. § 2000e(b).  Specifically, the *Walters* Court held that, rather

than counting only the employees actually working or receiving compensation each day, all

employees with whom the employer has an employment relationship on a given day must be

counted.  519 U.S. at 206–07.  The Court explained that '[t]his test is generally called the

'payroll method,' since the employment relationship is most readily demonstrated by the

individual's appearance on the employer's payroll."  *Id.* at 206.  Significantly, the Court

emphasized that "what is ultimately critical under [this] method is the existence of an

---

[4] Throughout her opposition, Ms. Lemmon also argued the court should permit additional
discovery before ruling on the summary judgment motion.  (Opp'n 1, 10–12, 14, 18, 23, Doc.
No. 20.)  However, Ms. Lemmon's counsel withdrew this request during oral argument at
hearing on June 25, 2020.  Therefore, the court does not address the request for additional
discovery.

employment relationship, not appearance on the payroll; an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law . . . would not count toward the 15-employee minimum." *Id.* at 211 (citation omitted).

Ms. Lemmon argues the physician-shareholders must be counted as employees under Title VII because they appear on RMA's payroll. (Opp'n 13, Doc. No. 20.) However, as *Walters* explicitly stated, it is the existence of an employment relationship—not appearance on the payroll—that is crucial to the question of whether an individual should be counted as an employee under Title VII. 519 U.S. at 211. Moreover, the existence of an employment relationship is determined based on "traditional principles of agency law." *Id.* The Supreme Court in *Clackamas* adopted the six-factor test based on these common-law principles, and the *Clackamas* test is used to determine whether an individual counts as an "employee" under Title VII. *See Clackamas*, 538 U.S. at 448–50; *Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 952 (7th Cir. 2014) (explaining that the *Clackamas* test was "designed to reflect the common law element of control," and applying the test to determine whether a physician-shareholder was an employee under Title VII). Accordingly, the court rejects Ms. Lemmon's argument that RMA's physician-shareholders are employees under Title VII simply because they appear on RMA's payroll. Regardless of whether the physician-shareholders are on the payroll, they may be counted toward Title VII's fifteen-employee requirement only if they qualify as "employees" under the *Clackamas* test.

It is undisputed that if the physician-shareholders are excluded, RMA employed fewer than the requisite fifteen employees "for each working day in each of twenty or more calendar weeks" during the relevant time period, 42 U.S.C. § 2000e(b). (Mot., Facts ¶ 44, Doc. No. 17 (stating that RMA had twelve countable employees in 2016); Ex. F to Reply, "Corrected Slade

Decl." ¶ 9, Doc. No. 21-1 (stating that RMA had thirteen countable employees in 2017); Opp'n

9, Doc. No. 20 (disputing those numbers solely on the belief that the physician-shareholders

should also be counted).)  Thus, the determinative issue before the court on summary judgment

is whether, based on the undisputed facts set forth above, the physician-shareholders are

employees for purposes of Title VII under the *Clackamas* test.

## B.  The *Clackamas* Test

The court considers each of the six factors set forth in *Clackamas*, bearing in mind that

"no one factor [is] decisive."  538 U.S. at 451 (quotations omitted).

### 1.  Whether the Organization Can Hire or Fire the Individual or Set the Rules and Regulations of the Individual's Work.

Under the first factor, the court initially considers RMA's ability to hire and fire

physician-shareholders, and then turns to its ability to set the rules and regulations of their work.

#### i.  *Hiring and Firing*

RMA asserts that it "cannot hire or fire its physician-shareholders in the usual sense of an

employment relationship."  (Reply 8, Doc. No. 21; *see also* Mot. 13, Doc. No. 17.)  RMA notes

that physician-shareholders are required to purchase a share of ownership in RMA, are entitled to

written notice and a thirty-day cure period prior to termination, have the right to protest the

termination via a presentation, and can be terminated only by a majority vote of the other

physician-shareholders.  (Mot. 14; Doc. No. 17; Reply 8, Doc. No. 21.)

While Ms. Lemmon does not dispute these facts, she claims the Shareholder Employment

Agreement is a "hiring document" and points out that it allows RMA to terminate physician-

shareholders for failure to comply with its terms.  (Opp'n 15–17, Doc. No. 20.)

Courts applying the *Clackamas* test have held that physician-shareholders were not

employees where hiring and firing decisions were made by a vote of shareholders or board

members.  *See Bluestein*, 769 F.3d at 953; *Cronkhite v. Unity Physician Grp., P.C.*, No. 1:05-cv-1577, 2007 U.S. Dist. LEXIS 24884, at *18–21 (S.D. Ind. Mar. 30, 2007) (unpublished); *Pearl v. Monarch Life Ins. Co.*, 289 F. Supp. 2d 324, 328 (E.D.N.Y. 2003).  For instance, in *Bluestein*, the court held that a physician-shareholder was not an employee where "hiring and firing decisions were made collectively by the shareholder-board members" and the physician-shareholder voted on her own termination.  769 F.3d at 953.  The court found that "the right to cast a vote equal to that of any other board member unequivocally indicates that [the physician-shareholder] was an employer rather than an employee for the purposes of hiring and firing."  *Id.* Similarly, in *Cronkhite*, the court held that a physician-shareholder was not an employee where termination required a vote of seventy-five percent of the board of directors.  2007 U.S. Dist. LEXIS 24884, at *18–21.  The court reasoned that the organization "would have faced much steeper hurdles in doing so than applied in terminating a non-shareholder physician."  *Id.* at *20. In *Pearl*, the court concluded that a physician-shareholder was not an employee because, among other things, he "could be neither hired nor fired in the usual sense."  289 F. Supp. 2d at 328.

The court finds these cases persuasive and applicable to the undisputed facts presented here.  With respect to hiring, physician-shareholders attain this status in RMA by purchasing a share of ownership rather than being "hired" in the usual sense.  (Mot., Facts ¶ 7, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 12, Doc. No. 17-2); s*ee Pearl*, 289 F. Supp. 2d at 328.  With respect to firing, as in *Bluestein* and *Cronkhite*, termination decisions at RMA are made collectively by a vote of the physician-shareholders.  (Mot., Facts ¶ 18, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 26, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., Agreement ¶ 4, Doc. No. 17-2.)  Although Ms. Lemmon attempts to distinguish *Bluestein* on the grounds that RMA's physician-shareholders cannot vote on their own termination, as they could in *Bluestein* (Opp'n 16, Doc. No. 20), the

13

key point is that termination at RMA requires a vote of physician-shareholders, who collectively have control over the decision.  *See Bluestein*, 769 F.3d at 953.  Indeed, the *Bluestein* court noted that being in the minority position on a vote does not diminish the right of control.  *Id.*  Additionally, RMA's physician-shareholders have specific rights which create "steeper hurdles" for their termination, including the right to written notice, a thirty-day cure period, and the opportunity to give a presentation challenging termination.  (Ex. 2 to Ex. A to Mot., Agreement ¶ 4, Doc. No. 17-2); *see Cronkhite*, 2007 U.S. Dist. LEXIS 24884, at *20.  Under these circumstances, the court concludes RMA's physician-shareholders are not hired or fired "in the usual sense."  *See Pearl*, 289 F. Supp. 2d at 328.

For these reasons, the court concludes the first part of the initial factor—the organization's ability to hire and fire the individual—weighs against a finding that RMA's physician-shareholders are employees.

### ii.  Rules and Regulations

RMA does not specifically address in its motion whether RMA can set the rules and regulation of its physician-shareholders' work.  Ms. Lemmon asserts that RMA "can and does set rules and regulations for each physician's work," and points to the provision of the Shareholder Employment Agreement requiring each physician-shareholder to "'comply with the Rules and Regulations of [RMA] governing the practice of medicine and anesthesiology.'"  (Opp'n 16–17, Doc. No. 20 (quoting Ex. 2 to Ex. A. to Mot., Agreement ¶ 6, Doc. No. 17-2).)  RMA replies that all physician-shareholders have an equal vote regarding RMA's rules and regulations.  (Reply 9, Doc. No. 21.)

In *Clackamas*, the Supreme Court indicated evidence that the physician-shareholders were required to "comply with the standards established by the clinic" could support a

14

conclusion that they were employees.  538 U.S. at 451, 451 n.11.  But in *Bluestein*, the court

concluded this factor weighed against a finding that a physician-shareholder was an employee

where "it was not the 'organization' but the physician-shareholders who collectively voted at

board meetings on the rules and regulations that governed all of the staff."  769 F.3d at 953.  The

court reasoned that although the physician-shareholder could not "unilaterally take a vacation

day, set her own schedule, [or] assign cases to herself," she was "one of the decision-makers who

determined the rules and regulations that governed her own work and the work of others at the

organization."  *Id.*

As in *Clackamas*, RMA's physician-shareholders are required to comply with the rules

and regulations of the organization.  (Ex. 2 to Ex. A. to Mot., Agreement ¶ 6, Doc. No. 17-2.)

On the other hand, similar to *Bluestein*, RMA's Shareholder Employment Agreement provides

that physician-shareholders are "officer[s] of the corporation and [are] able to vote on all matters

pertaining to the operation of the corporation."  (Ex. 2 to Ex. A to Mot., Agreement ¶ 16, Doc.

No. 17-2.)  In other words, although the Shareholder Employment Agreement requires

compliance with rules and regulations, the physician-shareholders are the decision-makers who

collectively vote on these matters.  (*Id.*); *see also Bluestein*, 769 F.3d at 953.  Because RMA's

physician shareholders are subject to RMA's rules and regulations but also have a say in

determining those rules and regulations, the court concludes this factor neither weighs in favor of

nor against a finding that RMA's physician-shareholders are employees.

2.  Whether and, if So, to What Extent the Organization Supervises the Individual's Work.

RMA asserts that it does not supervise the physician-shareholders' work because

physician-shareholders are left to their own discretion as to how to practice anesthesiology and

they do not report to any supervisor.  (Mot. 15–16, Doc. No. 17.)  Ms. Lemmon counters that the

Shareholder Employment Agreement provides physician-shareholders are subject to RMA's direction "'with respect to *all* business matters connected with his/her practice of medicine and anesthesiology,'" including "'whom he/she may accept as patients, the procedures he/she may perform, the charges that may be made for professional services performed by him/her, and the hours of the day or night that he/she must be on duty." (Opp'n 17–18, Doc. No. 20 (quoting Ex. 2 to Ex. A to Mot., Agreement ¶ 6, Doc. No. 17-2) (emphasis added by Ms. Lemmon).) Ms. Lemmon claims this language suggests a "substantial amount[] of supervision" by RMA. (*Id.* at 17.)

When considering this factor, the court in *Bluestein* concluded the "salient point is that [the physician-shareholder] could point to no supervisor at [the organization] who dictated how [she] practiced anesthesiology. As a physician, she determined how to complete the specific tasks of her work." 769 F.3d at 954. Although the physician-shareholder could not unilaterally change her work schedule or take a leave of absence, the court found that "these are not matters relating to the supervision of her work as an anesthesiologist but are more in the nature of [] general office rules and policies" and did not constitute evidence of supervision. *Id.* at 953.

For these same reasons, the court is not persuaded that the Shareholder Employment Agreement provides evidence that the physician-shareholders are supervised in their work as anesthesiologists. Although, as Ms. Lemmon notes, the physician-shareholders are required to comply with RMA's rules and regulations and are subject to the direction of the board as a whole with respect to business matters, the Agreement provides they are "free to exercise [their] own judgment as to how to treat a particular patient." (Ex. 2 to Ex. A to Mot., Agreement ¶ 6, Doc. No. 17-2.) Moreover, none of the physician-shareholders are tasked with supervising the others'

work.  (Mot., Facts ¶ 25, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 30, Doc. No. 17-2.)  Thus, this factor weighs against a finding that the physician-shareholders are employees.

3.  <u>Whether the Individual Reports to Someone Higher in the Organization.</u>

The undisputed evidence shows the physician-shareholders are all equal in RMA's hierarchy, and they do not report to any other individual who is higher in the organization. (Mot., Facts ¶¶ 24–25, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶¶ 29–30, Doc. No. 17-2.) However, as Ms. Lemmon points out, even though the physician-shareholders do not report to a single individual, they report to the board as a whole.  (Opp'n 18, Doc. No. 20.)  Even so, this fact does not support Ms. Lemmon's position, because the physician-shareholders are themselves co-equal members of this board.  (Mot., Facts ¶ 13, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶¶ 19–20, Doc. No. 17-2.)  Other courts examining this issue have found shareholder-directors do not "report to someone higher" under the *Clackamas* test when they report to the same board of which they are members.  *See, e.g.*, *Fichman v. Media Ctr.*, 512 F.3d 1157, 1161 (9th Cir. 2008) (concluding that nonprofit directors did not "report to someone higher in the organization in any traditional way" where "[t]he [b]oard as a whole act[ed] as the ultimate supervisor"); *Rodal v. Anesthesia Grp. of Cent. N.Y.*, 2006 U.S. Dist. LEXIS 98111, at *11 (N.D.N.Y. Jan. 23, 2006) (unpublished) (physician-shareholder was not an employee where he did not report to any individual but to the group itself, of which he was a member).  The court finds these cases persuasive and concludes this factor weighs against a finding that the physician-shareholders qualify as employees.

4.  <u>Whether and, If So, to What Extent the Individual Is Able to Influence the Organization.</u>

It is undisputed that RMA's physician-shareholders are able to influence RMA by voting on "all matters pertaining to the operation of the corporation."  (Ex. 2 to Ex. A to Mot.,

Agreement ¶ 16, Doc. No. 17-2.)  Each of the physician-shareholders is given an equal vote on

RMA's business decisions and operations.  (Mot., Facts ¶ 13, Doc. No. 17; Ex. A to Mot., Slade

Decl. ¶¶ 19–20, Doc. No. 17-2.)  Other courts considering similar facts have concluded this

factor weighs against a finding that an individual is an employee under the *Clackamas* test.  *See*

*Bluestein*, 769 F.3d at 954 (concluding that physician-shareholder was not an employee where

"she was an equal shareholder entitled to vote on all matters coming before the board," even

though she frequently found herself in the minority position); *Pearl*, 289 F. Supp. 2d at 328

(physician-shareholder was not an employee where he and his two partners were co-equals and

he exercised one-third of the influence upon his organization).  Accordingly, this factor weighs

against a finding that the physician-shareholders are employees.

     5.  <u>Whether the Parties Intended that the Individual Be an Employee, as Expressed in Written Agreements or Contracts.</u>

RMA's Shareholder Employment Agreement unequivocally provides that the

"[p]hysician shall be an employee of [RMA]."  (Ex. 2 to Ex. A to Mot., Agreement ¶ 3, Doc. No.

17-2.)  The Agreement refers to the physician-shareholders as employees throughout the

document.  (*Id.* ¶¶ 2, 3, 7, 9.)  In addition, the Agreement indicates the physician-shareholder

shall be "entitled to all of the rights and bound by all of the obligations" incident to his/her status

as an employee of RMA.  (*Id.* ¶ 3.)  Also referenced in the Agreement is an "employee benefits

package," (*id.* ¶ 7), and "bargained for conditions of employment," (*id.* ¶ 8).  This language

throughout the Shareholder Employment Agreement stands as evidence that the parties intended

that the physician-shareholders be employees of RMA.  Thus, this factor weighs in favor of a

finding the physician-shareholders are employees.

6. <u>Whether the Individual Shares in the Profits, Losses, and Liabilities of the Organization.</u>

As set forth in the Shareholder Employment Agreement, RMA's physician-shareholders are not paid a fixed salary but are instead paid a monthly draw based on the income collected by RMA minus certain operating expenses.  (Mot., Facts ¶ 20, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 42, Doc. No. 17-2; Ex. 2 to Ex. A to Mot., Agreement Exhibit A ¶ A(2), Doc. No. 17-2.) RMA presented uncontroverted evidence that the pay of RMA's physician-shareholders varies based on fluctuating income and expenses.  (Mot., Facts ¶ 22, Doc. No. 17; Ex. A to Mot., Slade Decl. ¶ 44, Doc. No. 17-2.)

Ms. Lemmon asserts that "the salary of RMA's physicians depends on [their] continued employment with RMA and the work that [they] perform[] during that employment."  (Opp'n 22, Doc. No. 20.)  She also notes that the physician-shareholders are not entitled to income generated after their termination.  (*Id.*)  While this may be true, the relevant inquiry is not whether the physician-shareholders are paid for their work, but whether they share in the profits and losses of the organization.  The compensation provisions in the Shareholder Employment Agreement unequivocally show RMA's profits and losses are used to calculate the physician-shareholders' monthly compensation.  (Ex. 2 to Ex. A to Mot., Agreement Exhibit A ¶ A(2), Doc. No. 17-2.) Based on these provisions, it is clear the physician-shareholders share in RMA's profits and losses.

Ms. Lemmon claims RMA's physician-shareholders do not share in the liabilities of RMA because they are not personally liable for RMA's corporate liabilities.  (Opp'n 22–23, Doc. No. 20.)  However, as RMA notes, the physician-shareholders each pay a proportionate share of the cost of malpractice insurance.  (Reply 17, Doc. No. 21; Ex. 2 to Ex. A to Mot., Agreement ¶ 11, Doc. No. 17-2.)  Whether or not the physician-shareholders are personally

responsible for the liabilities of the corporation, the uncontroverted evidence shows they share in RMA's profits and losses.  Based on this undisputed fact, this factor weighs against a finding that the physician-shareholders are employees of RMA.

* * *

Viewing the undisputed facts presented on summary judgment in light of the six *Clackamas* factors, the court concludes the physician-shareholders are not employees of RMA for purposes of Title VII.  As described above, RMA's physician-shareholders cannot be hired or fired in the usual sense, they are not supervised in their day-to-day medical practice, they do not report to anyone higher in the organization, they are able to influence the organization through co-equal voting rights, and they share in the profits and losses of the organization.  The only factor unequivocally supporting a contrary conclusion is the fifth factor—the intent of the parties based on written agreements—because the Shareholder Employee Agreement explicitly classifies the physician-shareholders as "employees" of RMA.  Notwithstanding this, the fifth factor is not determinative and must be weighed against the other factors.  *See Clackamas*, 538 U.S. at 450 ("Nor should the mere existence of a document styled 'employment agreement' lead inexorably to the conclusion that either party is an employee."); *Rodal*, 2006 U.S. Dist. LEXIS 98111, at *18 ("The mere fact that the shareholder/directors were called 'employees' in their Employment Agreements does not address the relevant issue here—how the business was actually run.").  The court concludes this factor is outweighed by the other factors supporting the conclusion that RMA's physician-shareholders are not employees.  This conclusion is consistent with other cases to have considered whether physician-shareholders are employees under similar circumstances.  *See Bluestein*, 769 F.3d at 956; *Cronkhite*, 2007 U.S. Dist. LEXIS 24884, at *33; *Rodal*, 2006 U.S. Dist. LEXIS 98111, at *17–18; *Pearl*, 289 F. Supp. 2d at 328.

Because the physician-shareholders are not employees for purposes of Title VII, RMA had fewer than fifteen employees during the relevant time period and is not subject to the requirements of Title VII.  Accordingly, Ms. Lemmon cannot prevail on any of her claims against RMA under Title VII.

## **CONCLUSION**

For these reasons, the court GRANTS RMA's Motion for Summary Judgment (Doc. No. 17) and enters summary judgment in favor of RMA and against Ms. Lemmon on all claims.

DATED this 25th day of August, 2020.

BY THE COURT:


Daphne A. Oberg
United States Magistrate Judge